**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
HATTIESBURG DIVISION**

**JONATHAN R. TALBOT**

**VS.**                                             **CIVIL ACTION NO. 2:09cv109-KS-MTP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security**

**ORDER ACCEPTING MAGISTRATE JUDGE'S REPORT
AND RECOMMENDATION AND DISMISSING CASE WITH PREJUDICE, ETC.**

This cause is before the Court on Plaintiff Jonathan R. Talbott's[1] action pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner denying his claim for a period of disability and disability insurance benefits and supplemental security income. The Defendant has filed a Motion to Affirm the Decision of the Commissioner [16] and Plaintiff has filed a Motion for Judgment on the Pleadings [12]. Magistrate Judge Michael T. Parker has filed a Report and Recommendation [18], which has been objected to by Plaintiff [19] and replied to by the Defendant [20]. The Court has considered the record, the above pleadings, the applicable law, and being fully advised in the premises, finds that the Commissioner's decision should be **affirmed** for the following reasons, to-wit:

**I. PROCEDURAL HISTORY**

Talbott applied for child disability benefits ("CDB") under Title II of the Social Security Act on June 14, 2005, and applied for supplemental security income benefits ("SSI") and

---

[1]On the docket and in Plaintiff's Complaint [1], "Talbot" is spelled with one "t." However, Plaintiff's medical records and subsequent pleadings indicate the correct spelling of Plaintiff's name is "Talbott" with two "t's."

disability insurance benefits under Title XVI of the Act on July 25, 2006.[2]  (Tr. 12; 28-29; 57-60.)[3]  In his applications for benefits, Talbott alleged disability beginning February 23, 1999.  (Tr. 12, 58-60; 81-86.)  His claims were denied initially on October 26, 2005, and upon reconsideration on July 13, 2007.  (Tr. 12; 28-29; 42-44; 57.)

Talbott was appointed counsel on March 23, 2007, and requested a hearing before an Administrative Law Judge ("ALJ") on July 24, 2007.  (Tr. 39-41; 48.)  On July 15, 2008, the hearing requested by Talbott was convened before ALJ Lanier Williams.  (Tr. 454.)   ALJ Williams heard testimony from Talbott, Kirby Simmons (Talbott's guardian),[4] and Katrina Virden, a vocational expert ("VE").  (Tr. 392-441.)  Employing the five-step sequential

---

[2]By decision of Administrative Law Judge Charles Bridges dated February 8, 2000, Talbott (who was 13 years of age at the time) was found to be entitled to SSI benefits as a disabled child due to attention deficit hyperactivity disorder (ADHD), bipolar disorder, obsessive compulsive disorder, and post traumatic stress disorder.  (Tr. 12).  Later, Talbott was awarded survivor's benefits on the account of his father, Robert Wayne Talbott, who committed suicide by hanging in July, 2003.

According to the Administrative Law Judge Lanier Williams' written opinion on Talbott's current applications, these benefits were subsequently terminated in December 2004, when Talbott reached age eighteen.  *Id.*  However, the transcript of the hearing before Judge Williams on July 15, 2008, indicates that these benefits terminated in December 2005, when Talbott reached age nineteen. (Tr. 397-98.)  Judge Williams' written opinion states that the determination was never appealed.  (Tr. 12).

[3]All cites herein to the Transcript ("Tr. ____") are to the certified copy of the Transcript of the Administrative Record, filed with the court under seal.  *See* [8][9].

[4]Simmons testified that he had been Talbott's guardian since he was fourteen years old.  Simmons stated that while he is not Talbott's legal guardian, Talbott's mother gave him power of attorney over Talbott because he had problems with his stepfather.  Talbott's biological father passed away in July 2003, when Talbott was sixteen.  (Tr. 418-19.)  Talbott moved back in with his mother after his stepfather went to prison, which was a few months before the hearing.  (Tr. 419.)

evaluation process specified in 20 C.F.R. § 404.1520(a) and § 416.920(a),[5] on September 10, 2008, the ALJ rendered his decision that Talbott was not disabled within the meaning of the Social Security Act. (Tr. 9-27.) Talbott then requested review by the Appeals Council on September 16, 2008. (Tr. 30.) The Appeals Council found no basis for changing the decision of the ALJ, and on April 21, 2009, denied Talbott's request for review, thereby rendering the ALJ's decision the final decision of the Commissioner. (Tr. 4-6.)

Aggrieved by the Commissioner's decision to deny benefits, Talbott filed a complaint in this court on June 9, 2009, seeking an order reversing the Commissioner's final decision and awarding him benefits, or remanding the case to the Commissioner for further administrative action as directed by the court. Complaint [1]. The Commissioner answered [6] the complaint denying that Talbott is entitled to any relief. The parties having filed dispositive motions pursuant to the Local Standing Order in Social Security Cases [10], the matter is now ripe for decision.

**Medical/Factual History**

Talbott was twenty-one years old at the time of the hearing. Talbott has a history of mental illness, is slow intellectually, and dropped out of high school during the twelfth grade. He does not have his GED. Talbott testified that he has never held a job. He testified that he

---

[5] The five steps focus on:
1) whether the claimant is engaged in substantial gainful activity,
2) whether the claimant has a severe impairment,
3) whether the claimant has an impairment that meets or equals an impairment found at 20 C.F.R. Part 404, Subpart P, Appendix 1;
4) whether the claimant can return to prior relevant work, and
5) whether there is any work that exists in significant numbers in the national economy that the claimant can perform.

tried working for a friend in masonry once or twice a month, but was unable to do it correctly. (Tr. 225; 399-406; 416.)

Talbott was admitted to the Pine Grove Child Adolescent Center ("Pine Grove") on June 30, 1999, at the age of twelve for psychosis and behavioral problems. He was receiving outpatient treatment and was admitted after his behavior worsened. He began hearing voices, chasing children with knives, became easily angered and irritated, was impulsive, hyperactive, and out of control. Prior to admission, he was diagnosed with bipolar disorder with psychosis and attention deficit hyperactivity disorder ("ADHD"). Upon admission, he was taking Depakote, 1,000 mg. twice daily; Risperdal, __ mg.[6] a.m. and 1 mg. p.m.; and Ritalin SR, 20 mg. a.m. (Tr. 95-96; 117-18.)

Dr. Kevin Passer's mental evaluation of Talbott on July 2, 1999, indicates Talbott was actively psychotic, hyperactive and having auditory hallucinations. Talbott had suicidal ideation and said he wished he were dead. His insight was partial and his judgment impaired. Dr. Passer's diagnostic impression was as follows:

|         |                                                                    |
|---------|--------------------------------------------------------------------|
| Axis I  | 1. Bipolar disorder, severe, recurrent, depressed with psychotic features. |
|         | 2. Asperger's disorder (provisional)                               |
|         | 3. Rule out learning disorder                                      |
|         | 4. Disruptive behavior disorder                                    |
|         | 5. Parent/child relationship problem                               |
|         | 6. Attention Deficit Hyperactivity Disorder by history, combined type. |
| Axis II.  | Deferred.                                                        |
| Axis III. | No known medical problems at the present time.                   |
| Axis IV  | Severe due to problems in all major life areas.                   |
| Axis V   | Global assessment of functioning ["GAF"][7] at time of admission is 35.[8] |

---

[6]There is a blank space on the record before the "mg."

[7]"GAF is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" *Boyd v. Apfel*, 239 F.3d

(Tr. 118-19.)  Dr. Passer admitted Talbott to Pine Grove's psychiatrically safe ward to be observed closely in all activities.  *Id.*  Talbott was a patient at Pine Grove from June 30, 1999 to July 25, 1999.  Upon his discharge, Dr. Passer reported the following multiaxial diagnosis:

| | |
|---|---|
| Axis I. | Bipolar disorder, mixed, severe. |
| | Asperger's disorder. |
| Axis II | Cluster A trait. |
| Axis III | None. |
| Axis IV | Severe in all areas. |
| Axis V | GAF 35 on admission. |

(Tr. 120.)  Dr. Passer prescribed Carbatrol and Seroquel and noted that Talbott was able to be maintained and stabilized on these medications during his admission.  Talbott denied any homicidal or suicidal ideations and denied any auditory or visual hallucinations at the time of his discharge.  He was to begin the Partial Hospitalization Program for therapy on July 26, 1999, from 9:00 a.m. to 4:00 p.m., five days a week for two weeks, and then to be transitioned back into the school system.  (Tr. 120-123.)

The record reflects that Talbott received out-patient treatment at Pine Belt Mental Healthcare Resources ("Pine Belt") from September 8, 1999 - June 1, 2008, for ADHD, bipolar disorder, and obsessive compulsive disorder ("OCD").  For the most part, Talbott seemed to do well when compliant with his prescribed medication.  (Tr. 163-93; 234-391.)

Plaintiff was treated primarily by Dr. B.E. Smith and Dr. A.F.M. Haque at Pine Belt from

---

698, 701 n.2 (5th Cir. 2001) (quoting Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed. 1994) (hereinafter "DSM-IV")).

[8]"A GAF between 31 and 40 means that there is some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Ducre v. SBC-Southwestern Bell*, No. SA-04-CA-835-XR, 2007 WL 128900, at *2 (W.D. Tex. Jan. 12, 2007).

October 2003 to April 2006.  His diagnoses included bipolar disorder, ADHD, OCD, and major depression with psychotic features.  It was noted that both his mother and father had a history of mental illness.  Talbott's physicians reported that he did well when he complied with his medications.  (Tr. 163-93; 341-76.)

Talbott's school records reflect he mainly received average to below average grades, and had to repeat grades seven and eleven.  In the Spring of 2004, when he was in the tenth grade, Talbott received a passing score in Algebra in Mississippi's Subject Area Testing Program. In the Fall of 2004 and the Spring of 2005, he received failing scores in English in the Testing Program.  (Tr. 133-60; 195.)  Talbott performed on a seventh grade level in reading and arithmetic at age 18 when tested using the Wide Range Achievement Test - Revision 3.  The records reflect that in January 2005, Talbott was arrested for making a bomb threat in school; he said it was intended as a joke.  Talbott was placed in an alternative school in 2005.  Talbott dropped out of school in the twelfth grade, apparently because he did not complete his senior project, and never got his GED.  (Tr. 166-67; 194-96; 225.)

On July 27, 2004, Talbott (then age 17) was seen by Dr. Scott Carlton at the Columbia Clinic for a physical exam requested by the Medicaid Office to "basically recertify his disability status."  His assessment was bipolar disorder, psychotic features and ADHD.  Dr. Carlton noted that these conditions were controlled while Talbott stayed on his medications, and that Talbott needed supervision to maintain appropriate regimen of his medications.  (Tr. 114-15; 231-32.)

On August 26, 2005, Talbott underwent a Comprehensive Mental Status/Psychological Evaluation by Joanna McCraney, Ph.D., by referral of the Office of Disability Determination Services ("DDS").  In summary, Dr. McCraney noted Talbott's extensive psychiatric history,

including bipolar disorder, ADHD, psychosis, self-mutilation, and auditory hallucinations. She opined, "He will continue to be challenged in both the classroom environment, and outside, as well as in his social interactions and interaction with authority figures." She further concluded,

> He is a very appropriate candidate to receive benefits, particularly in light of his need to access the Medicaid system in order to continue receiving his psychotropic medications. His symptoms and behavior are likely to decompensate otherwise. Given his Cluster A traits, psychosis, Bipolar, together with ADHD, he needs continued compliance with medication and any form of treatment that is helping to keep his symptoms and behavior stabilized. Prognosis depends on access to and compliance with continuing treatment, but is guarded to fair even so.

(Tr. 194-97.) Dr. McCraney's diagnostic impressions were:

    Axis I -        1. Bipolar Disorder with mood congruent psychotic features.
                      2. Rule Out Schizophrenia.
                      3. ADHD combined type with impulsivity.
    Axis II -       1. Personality Disorder with Cluster A traits.
                      2. Rule Out Antisocial Personality Disorder.

(Tr. 194-97.)

On October 25, 2005, Sharon Kim Scates, Ph. D., completed a Mental Residual Functional Capacity Assessment based on Talbott's medical records. She concluded that Talbott was capable of understanding, remembering, and carrying out simple and more detailed instructions and tasks; that he could concentrate and attend for two hour periods; interact adequately with supervisors, coworkers, and the public; and adapt adequately in order to complete a normal workweek without excessive interruption from psychologically based symptoms. (Tr. 199-202.) Dr. Scates also completed a Psychiatric Review Technique form dated October 25, 2005. Dr. Scates noted mild limitations in the activities of daily living, and moderate limitations in maintaining social functioning, concentration, persistence and/or pace. (Tr. 213.)

Talbott met with a counselor and/or case manager from Pine Belt every few weeks from approximately August 18, 2005 to June 1, 2008.  During 2006, Talbott was mostly compliant with his medication and his observed behavior was usually normal.  However, it was noted that his caretaker had to remind him to take his medication, and Talbott occasionally reported problems with academics, school discipline, negative peer pressure at school, sleeplessness, depression, and hallucinations.  (Tr. 238-391.)

On July 10, 2006, Dr. Kevin Passer saw Talbott at Pine Belt and noted his diagnosis of bipolar disorder with psychosis; he concluded Talbott was doing "about as well as expected." Dr. Passer increased Talbott's Seroquel dosage and changed his Tegretol prescription to Trileptal.  (Tr. 325.)  On August 9, 2006, Dr. Passer noted that Talbott was doing better on his current medical regimen and advised him to return to the clinic in two months.  (Tr. 322.)  On November 8, 2006, Talbott presented to Dr. Passer and reported that he was "still edgy as hell" and that he was easily angered.  Dr. Passer increased his Seroquel dosage.  (Tr. 306.)

During 2007, Talbott was mostly compliant with his medication and his observed behavior was usually normal.  However, it was noted that his caretaker had to remind him to take his medicine, and Talbott occasionally reported problems with academics, sleep, depression, paranoia, hallucinations, anger, and lack of friends.  Talbott also reported talking to himself due to lack of friends.  (Tr. 251-99.)  On February 5, 2007, Dr. Passer noted that Talbott was doing well on his current medical regimen and working hard in school.  (Tr. 292.)  On May 2, 2007, Dr. Passer noted that Talbott was not doing as well.  He had gotten off his medication, but was now back on it.  (Tr. 281.)

Talbott was treated regularly by Dr. Roger Anastasio at Pine Belt from June 2007 to

March 2008 for bipolar disorder and ADHD.  Overall, Talbott seemed to do well while on medication, but did sometimes report auditory and visual hallucinations and social isolation. Further, Dr. Anastasio observed mild psychomotor retardation and reported a GAF score of 50[9] during his visits dated July 2007 - December 2007.  (Tr. 253-76.)

On June 28, 2007, Talbott (then age 20) met with William P. Osborn, Ph. D., for a comprehensive mental status evaluation pursuant to the referral of the DDS Office.  Dr. Osborn noted that DDS did not provide any records for his review. Dr. Osborn noted Talbott's education history, his mental illness history and treatment at Pine Belt, and his prior trouble with the law (i.e., breaking into a house and stealing a bicycle, calling in a bomb threat to the school, and for attacking a friend.)  Dr. Osborn noted that Talbott has had no hospitalization since the age of twelve in 1999.  Dr. Osborn noted that Talbott lived with Mr. Simmons, his caretaker, and that he had a driver's license and was able to drive.  He further noted that Talbott was able to perform routine hygiene and grooming activities and household chores, and had the basic communication and social skills to interact with others.  (Tr. 224-29.)

Dr. Osborn observed that Talbott revealed a mild level of generalized anxiety, and that he reported hearing voices and seeing silhouettes.  He estimated Talbott's intellectual functioning level in the low average range.  Dr. Osborn made the following diagnosis on the DSM-IV model:

> Axis I:   At the current time he probably has some mild to moderate depression and anxiety but I didn't notice anything that would lead to any symptom pattern related to bipolar disorder or paranoid schizophrenia.  The potential paranoid issues that might have is

---

[9]"A GAF score of 41 to 50 is classified as reflecting 'serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).'" *Boyd v. Apfel*, 239 F.3d 698, 702 (5th Cir. 2001) (quoting DSM-IV at 32).

>            that he thinks that his friends mistreat him quite often.  He did
>            subscribe to some very vague visual and auditory hallucinations
>            but he couldn't give any kind of information where those
>            potentials could be explained.  He seems to be a rather active
>            person who does a great deal so it is somewhat of a surprise to see
>            a diagnosis such as Bipolar Disorder, Paranoid Schizophrenia, but
>            both he and his guardian do allege that he does quite well when he
>            is on his medication.
>
> Axis II:   I think there may be some notable personality factors in this
>            picture of compulsiveness and may even be some narcissism
>            involved.
>
> Axis III:  He doesn't really report any physical difficulties.

Dr. Osborn opined that Talbott "can engage in and complete age-appropriate activities and function in appropriate environments adaptively, interact with others adaptively and maintain concentration and attention." (Tr. 228-29.)

On July 13, 2007, Dr. David Powers, Clinical Psychologist, reviewed Talbott's mental rating and affirmed the rating given by Dr. Scates in 2005. (Tr. 230.)

Talbott continued to see Dr. Anastasio at Pine Belt from the end of 2007 through May 2008.  Dr. Anastasio noted that during his visits between December 20, 2007 and March 3, 2008, Talbott seemed to have improved and was working as a mason's helper.  On March 3, 2008, Dr. Anastasio increased his GAF score to 60.[10]  (Tr. 253-79.)  On May 22, 2008, Talbott met with Dr. Roger Anastasio at Pine Belt.  In his Psychiatric Progress Report, Dr. Anastasio noted that Talbott was recently working for an alarm installation company, but had to stop due to a lack of transportation.  Dr. Anastasio made the following diagnosis: bipolar I disorder (mixed severe

---

[10]A GAF score of 60 reflects "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR any moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers)." *Boyd*, 239 F.3d at 700.

with mood incongruent) and ADHD (predominantly inattentive type), and assessed a GAF score of 60. (Tr. 239-40).

On June 11, 2008, Talbott met with a counselor at Pine Belt. He reported that he was living was his mother and was doing well, compliant with his medications, and was not experiencing any symptoms of depression or anxiety, or any auditory or visual hallucinations. The counselor noted that Talbott's observed behavior was normal and appropriate. (Tr. 238.)

### The Administrative Law Judge's Analysis in This Case

After a hearing and upon considering the testimony and medical records, ALJ Williams rendered his decision on September 10, 2008. (Tr. 9-27.) As a preliminary matter, the ALJ explained that pursuant to a prior decision of ALJ Charles Bridges dated February 8, 2000, Talbott (who was 13 years of age at the time) was found to be entitled to SSI benefits as a disabled child due to ADHD, bipolar disorder, obsessive compulsive disorder, and post traumatic stress disorder. (Tr. 12). According to the ALJ's written opinion, these benefits were subsequently terminated in December 2004, when Talbott reached age eighteen and it was determined that his "disability" ceased.[11] That determination was never appealed. ALJ Williams found that the Commissioner's previous determination that Talbott's benefits be terminated was final and binding because Talbott failed to establish "good cause" as defined by 20 C.F.R. § 404.988-9 and § 416.1488-9 to reopen the determination. Accordingly, the ALJ explained that the remainder of his decision would only address Talbott's eligibility for benefits based on his current applications. (Tr. 12-15.)

Before proceeding to step one of the sequential analysis, the ALJ found that Talbott "is

---

[11]*See also*, footnote 2.

the 'child' of the wage earner, R. W. Talbott, who died fully insured for Social Security purposes in July 2003. The claimant is unmarried and will attain age 22 on December 19, 2008."[12]  (Tr. 15.)

At step one of the five-step evaluation process, the ALJ found that Talbott had not engaged in any substantial gainful activity at any time relevant to the decision.  At step two, he found that Talbott suffers from the following severe impairments: ADHD, Bipolar Disorder, and a remote history of testing showing borderline intellectual functioning.  (Tr. 15-20.)

However, at step three the ALJ determined that Talbott does not have an impairment, or combination of impairments, that meets or medically equals one of the listed impairments in 20 C.F.R. § 404, subpart P, Regulation 4, Appendix 1.  (Tr. 20-22.)  Next, the ALJ assessed Talbott's Residual Functional Capacity ("RFC"),[13] and found that he retained the capacity to perform work at all exertional levels not requiring more than simple, routine, repetitive work which would allow more than normal supervision,[14] and which would not be likely to put him in

---

[12]As explained by the ALJ, "With respect to the claim for a child's insurance benefits (disability), there is an additional issue whether the claimant is the 'child' of the deceased wage earner; whether he is unmarried and whether he was under a 'disability' commencing on or before the day he turned age 22 and whether the other requirements are met for him to be entitled to benefits under sections 202(d) and 223 of the Social Security Act." (Tr. 12.)  *See* 42 U.S.C.A. § 402(d).

[13]"Residual functional capacity" is defined in the Regulations as the most an individual can still do despite the physical and/or mental limitations that affect what the individual can do in a work setting. 20 C.F.R. § 416.945.

[14]The ALJ concedes that the limitation of "more than normal supervision" is vague. However, he states that the evidence as a whole does not require this restriction's inclusion in Talbott's RFC.  Accordingly, the jobs identified by the VE are jobs that can be performed absent the restriction.  (Tr. 22, footnote 1.)

a confrontational situation with his coworkers or the public.[15] The ALJ found that "the objective evidence did not establish by medically acceptable, clinical and laboratory diagnostic techniques the existence of impairments which could be reasonably expected to produce symptoms of the intense, protracted and totally disabling nature which the claimant alleges." (Tr. 24). The ALJ found that when Talbott was compliant with his prescribed medical regimen, he did well and appeared very capable of working. The ALJ further concluded that there were several discrepancies in the record regarding Talbott's daily functional limitations. (Tr. 22-25.)

At step four, the ALJ found that Talbott had no past relevant work. While he attempted work as a masonry assistant, he never performed the job sufficiently long enough for it to be considered vocationally relevant. Finally, at step five, the ALJ concluded that Talbott could perform a significant number of jobs in the national economy. The ALJ based this conclusion on Talbott's age, educational background, work experience, and RFC, and the testimony from the

---

[15]The ALJ explained that "In arriving at this decision, [he] carefully followed the guidance of Social Security Ruling 96-8p and 96-9p, in that [he ] carefully considered all of the claimant's limitations on a function-by-function basis . . . ." (Tr. 25.) The ALJ made the following findings with regard to Talbott's limitations:

> 1. Although, as noted above, the claimant apparently has a variety of unreported work activity, the record does not reflect he has ever performed any one job sufficiently long for it to be considered vocationally relevant. Hence, he has no vocationally relevant past work (20 CFR 404.1565 and 416.965).
> 2. The claimant was born on December 19, 1986 and was over the age of 18 years old at all times pertinent to this determination, which is defined as a younger individual age 18- 44 (20 CFR 404.1563 and 416.963).
> 3. The claimant has a limited education, but is at least literate and able to communicate in English (20 CFR 404.1564 and 416.964).
> 4. As the claimant has no vocationally relevant past work, he has no transferable work skills (20 CFR 404.1568 and 416.965).

(Tr. 25-26.)

VE. These jobs included a dishwasher, a groundskeeper, and a cafeteria attendant. Accordingly, the ALJ found that Talbott was not disabled. (Tr. 24- 27.)

## II.  STANDARD OF REVIEW

When a party objects to a Report and Recommendation this Court is required to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). See also *Longmire v. Gust*, 921 F.2d 620, 623 (5th Cir. 1991) (Party is "entitled to a *de novo* review by an Article III Judge as to those issues to which an objection is made.") Such review means that this Court will examine the entire record and will make an independent assessment of the law. The Court is not required, however, to reiterate the findings and conclusions of the Magistrate Judge. *Koetting v. Thompson*, 995 F.2d 37, 40 (5th Cir. 1993) nor need it consider objections that are frivolous, conclusive or general in nature. *Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1997). No factual objection is raised when a petitioner merely reurges arguments contained in the original petition. *Edmond v. Collins*, 8 F.3d 290, 293 (5th Cir. 1993).

## III. ISSUES

**Issue No. 1: Whether the ALJ erred in failing to reopen Talbott's termination of disability on December 19, 2004, after placing the termination of issue *sua sponte*.**

In Plaintiff's Objections to the Report and Recommendation the Plaintiff requested to withdraw Issue 1, the reopening of the termination of Plaintiff's prior period of childhood disability, etc. This request was not objected to by the Defendant and, therefore, Plaintiff's request to withdraw without prejudice to the Plaintiff, the issue of reopening the termination of Plaintiff's prior period of childhood disability, etc., is granted and this issue no longer needs to

be addressed by the Court.

**Issue No. 2: Whether the ALJ's conclusion that Talbot is not disabled based on his current application for disability is supported by substantial evidence.**

The standard of review that this Court must follow is whether there is substantial evidence to support the Commissioner's findings and whether the correct legal standards were applied in evaluating the evidence. Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983). To be substantial the evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames*, 707 F.2d. at 164 (citations omitted).

In reviewing the Commissioner's decision, Judge Parker went through the Administrative Law Judge's opinion and pointed out that the Administrative Law Judge gave the Plaintiff the benefit of the doubt as to his prior work experience. (Dkt. #18 at page 23). Further, the Report and Recommendation goes through the evidence establishing the Commissioner's decision. It is clear from the record that there are substantial conflicts in the testimony. There were many activities reported to the counselor at Pine Belt Mental Health Center by the Plaintiff. The records conflict with the testimony of Plaintiff and his caretaker. It is hard to imagine the disparity in the testimony of the Plaintiff and his caretaker with the records that are established by the treating physicians or mental health personnel. It is obvious that the Administrative Law Judge chose to believe the records and to discount the testimony. Also, the Plaintiff's condition

has changed as he as grown older and matured. It is apparent to this Court that the Plaintiff can do much more to take care of himself and to pursue gainful employment than he would have the Court to believe.

The objection is a challenge to the evidentiary basis of the Commissioner's finding. This Court finds that there is substantial evidence to support the Commissioner's findings and that this objection by the Plaintiff is without merit.

**Issue No. 3: Whether the ALJ erred in failing to properly comply with the Social Security Ruling ("SSR") 00-4P at Step 5 of the Analysis.**

The Objection is that the testimony of the vocational expert conflicts with the *Dictionary of Occupational Titles* ("DOT") and its companion publication, *The Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (*"SCO"*).* The complaint of Plaintiff is that the vocational expert offered the job as "grounds keeper" as unskilled when, in fact, it is a semi-skilled occupation under the DOT and SCO. Assuming that the Administrative Law Judge was incorrect, there are still two other occupations listed that do not conflict with the publications. This objection is without merit since the Plaintiff has not established prejudice as a result of the alleged error of the Administrative Law Judge.

## IV.  CONCLUSION

As required by 28 U.S.C. § 636(b)(1) this Court has conducted an independent review of the entire record and a *de novo* review of the matters raised by the objections. For the reasons set forth above, this Court concludes that Talbott's objections lack merit and should be overruled. The Court further concludes that the Report and Recommendation is an accurate statement of the facts and the correct analysis of the law in all regards. Therefore, the Court

accepts, approves and adopts the Magistrate Judges's factual findings and legal conclusions contained in the Report and Recommendation. Accordingly, it is ordered that the United States Magistrate Judge Michael T. Parker's Report and Recommendation is accepted pursuant to 28 U.S.C. § 636(b)(1) and that Jonathan R. Talbott's claims are **dismissed with prejudice**. All other pending motions are denied as moot.

**SO ORDERED this, the 4th day of November, 2010.**

*s/Keith Starrett*
**UNITED STATES DISTRICT JUDGE**